216 P.3d 1258

Mary Ann **LEE**, in her capacity as Personal Representative of the Estate of Ross Takehiko Unebasami, Deceased, and in her Personal Capacity, Plaintiff–Appellee, Cross–Appellant,

v.

**HAWAII PACIFIC HEALTH**, a Hawaii Not-for Profit Corporation, Defendant–Appellant, Cross–Appellee,

and

Kapi'Olani Medical Center for Women and Children, Defendant–Appellee, Cross–Appellant,

and

John Does 1–99; Jane Does 1–99; Doe Entities 1–20; and Doe Governmental Units 1–10, Defendants.

No. 28459.

Intermediate Court of Appeals of Hawai'i.

Sept. 29, 2009.

Arleen D. Jouxson, Rafael G. Del Castillo, Jouxson–Meyers & Del Castillo, on the briefs, for Plaintiff–Appellee, Cross–Appellant Mary Ann Lee.

Michael D. Tom, Beth Ann Madeline, Tom Petrus & Miller, LLLC, on the briefs, for

Defendant–Appellant, Cross–Appellee Hawaii Pacific Health and for Defendant–Appellee, Cross–Appellant Kapi'olani Medical Center for Women and Children.

FOLEY, Presiding Judge, FUJISE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

## I. *OVERVIEW*

Ross Takehiko Unebasami (**Ross**) was born on June 16, 1982. In 2000, when he was seventeen years old, he was diagnosed with acute lymphoblastic leukemia. Ross was initially treated with chemotherapy, but after a relapse that began in February of 2003, Ross received a bone marrow transplant at Kapi'olani Medical Center for Women and Children (**Kapi'olani**) on March 27, 2004. Ross died at another hospital on June 25, 2004, nine days after his twenty-second birthday.

This case stems from allegations that, when Ross suffered renal failure after the bone marrow transplant, he was denied admission to Kapi'olani's intensive care unit (**ICU**), a pediatric ICU, and transferred to another hospital's ICU over objections from Ross, his mother, and his treating physicians. The Complaint was filed on April 17, 2006 by Ross's mother, Mary Ann Lee (**Lee**), as personal representative of the Estate of Ross Takehiko Unebasami, deceased, and in her personal capacity, against Kapi'olani and Hawaii Pacific Health (**HPH**), Kapi'olani's parent corporation. The Complaint alleged, *inter alia,* that both Ross and his mother suffered serious emotional distress as a result of the defendants' allegedly wrongful conduct. The Complaint also alleged that, when Ross was accepted by Kapi'olani for his bone marrow transplant, defendants negligently misrepresented to Lee that Ross would be admitted, as necessary, to all of Kapi'olani's specialized facilities and would be cared for by all of its specialized staff, as necessary, and that Lee reasonably relied upon those representations in choosing Kapi'olani instead of a mainland bone marrow transplant facility.

The Circuit Court of the First Circuit[1] dismissed the Complaint on the grounds that Kapiʻolani and HPH are health care providers and, therefore, Lee's administrative remedies before the Medical Claims Conciliation Panel (**MCCP**) must be exhausted, as prescribed under Hawaii Revised Statutes (**HRS**) § 671–12(a), before a complaint can be filed in the Circuit Court. Final judgment was entered on February 23, 2007. Lee's claims on behalf of Ross's Estate were subsequently pursued in a separate action, following an MCCP proceeding. Lee's claims on her own behalf are the subject of her appeal in this case.

On March 22, 2007, HPH filed a notice of appeal and, on March 27, 2007, Lee filed a cross-appeal. Then, on April 10, 2007, HPH and Kapiʻolani also filed a cross-appeal.

On appeal, HPH argues that the Circuit Court erred in: (1) finding that HPH is a health care provider as defined in HRS Chapter 671; and (2) denying HPH an award of attorneys' fees based on Lee's frivolous filing of the Complaint. Lee contends that, because she has not asserted a claim as the victim of a medical tort, the Circuit Court erred in concluding that she was required to exhaust the administrative remedies of the MCCP. Kapiʻolani, like HPH, contends that the Circuit Court erred in failing to find that Lee had filed a frivolous lawsuit, and in denying its request for attorneys' fees. We affirm.

## II. *BACKGROUND AND PROCEDURAL HISTORY*

### A. *The Facts as Alleged in Lee's Complaint*

In the Complaint, Lee made the following factual allegations:

After Ross was first diagnosed with leukemia at the age of 17, he received care at Kapiʻolani's Hematology/Oncology unit. During this successful course of treatment, Ross developed a strong attachment to, and

confidence in, the nurses, doctors, and other staff on Kapiʻolani's Hematology/Oncology team. When Ross's leukemia recurred at age 20, in early 2003, it became apparent that a bone marrow transplant was the only treatment that might save his life. Dr. Kelley Woodruff (**Dr. Woodruff**), one of Ross's doctors and a pediatric oncologist, obtained approval for Ross's bone marrow transplant from his insurance carrier. Kapiʻolani's transplant coordinator was apprised of the insurer's approval and Dr. Woodruff initiated a search for a suitable bone marrow donor.

All bone marrow transplants in Hawaiʻi must be presented to and approved by a Transplant Committee, which meets at another hospital. After three presentations to the Transplant Committee, a lobectomy (surgical removal of a part of a lung) required by the Transplant Committee, other pre-transplant preparation, and the identification of a suitable donor, in January of 2004, the Transplant Committee approved Ross's transplant. The Director of Kapiʻolani's transplant program and Kapiʻolani's transplant coordinator agreed on behalf of Kapiʻolani that the transplant would be carried out at Kapiʻolani. The Transplant Committee approved Kapiʻolani to provide the facilities for the transplant and subsequent course of therapy and recovery.

Before deciding to go forward with the transplant in Hawaiʻi, Ross's parents considered taking him to a "world-renowned" cancer center on the mainland. But when his transplant was approved for Kapiʻolani, the family decided to stay at Kapiʻolani in the circumstances and with the staff with which Ross was most comfortable and familiar. It was anticipated that Ross would require a lengthy stay, approximately twelve weeks, in Kapiʻolani's isolation ward to safeguard against transplant rejection and infection.

Prior to his bone marrow transplant, on March 18, 2004, Ross was admitted to Kapiʻolani to begin his preconditioning chemotherapy under the direction of his other pediatric oncologist, Dr. Robert Wilkinson

---

1. The Honorable Victoria S. Marks presided.

(**Dr. Wilkinson**). On March 27, 2004, Dr. Woodruff performed Ross's bone marrow transplant. Lee was at her son's bedside throughout most of his hospital stay and remained involved in and informed about his care.

On or about April 4, 2004, Ross's condition began to deteriorate and Dr. Woodruff apprised Kapi'olani's transplant coordinator that Ross might require admission to the pediatric ICU. On April 16, 2004, Dr. Woodruff determined that Ross's kidneys were failing and she asked the charge nurse to arrange for his admission to the pediatric ICU for renal dialysis. When Dr. Woodruff initially attempted to transfer Ross's care to Dr. Rodney Boychuk (**Dr. Boychuk**) in the pediatric ICU, Dr. Boychuk declined to accept Ross on the grounds that he was an adult. Subsequently, Dr. Woodruff received a report that a group of HPH administrators were meeting with Dr. Boychuk in the pediatric ICU. She then received a call from Dr. Boychuk saying that he would accept Ross's transfer. However, due to an equipment shortage and the unavailability of a surgeon, Kapi'olani could not provide Ross with dialysis at that time. Dr. Woodruff was able to secure temporary admission for Ross at another hospital where he was able to get dialysis.

On April 19, 2004, Ross was transferred back to the bone marrow isolation ward at Kapi'olani. On April 20, 2004, Ross again needed dialysis and a dialysis machine was available. Ross was refused admission to the pediatric ICU at Kapi'olani and Ross's nephrologist arranged for dialysis in the isolation ward. That evening, Lee sought out the pediatric ICU's attending physician, to request that Ross be admitted if he required intensive care. Lee was informed that Ross would not be allowed on the pediatric ICU floor. She returned to the isolation ward in extreme emotional distress and shock.

On April 21, 2004, Lee was informed by the charge nurse that it was an administrative error and a miscommunication to admit Ross to Kapi'olani for a bone marrow trans-plant and that arrangements had been made to transport him permanently to another hospital. Lee became distraught at the news that Ross was being permanently transferred. While being prepared for transport, Ross pleaded with his mother to tell him what he could do so that Kapi'olani would take him back.

Ross was admitted to a regular ward at the other hospital, which did not have a bone marrow isolation ward. Ross believed that Kapi'olani was depriving him of optimal care and his only hope for survival. Lee watched helplessly as her son's optimism turned to hopelessness and despair. On June 25, 2004, Ross died due to unavoidable complications from his bone marrow transplant.

In their Answer to the Complaint, HPH and Kapi'olani admitted the basic course of Ross's illness and care, but denied any wrongdoing, asserting that the pediatric ICU at Kapi'olani was not the appropriate placement for Ross for multiple reasons and that his condition required transfer to another facility. The defendants specifically denied that Kapi'olani was the situs of the infliction of extreme emotional distress and raised multiple defenses to Lee's claims, including but not limited to the ones at issue in this appeal.

B. *The Proceedings Below*

After the April 17, 2006 Complaint was filed and answered, HPH and Kapi'olani filed a motion to dismiss all claims against Kapi'olani and to dismiss or grant summary judgment as to all claims against HPH. In the first instance, the defendants argued that Lee's claims against Kapi'olani must be dismissed for lack of subject matter jurisdiction because her claims alleged medical torts, which must first be submitted to the MCCP. In addition, HPH argued that: (1) HPH is not a medical provider and, therefore, cannot commit a medical tort as defined in HRS Chapter 671; (2) all claims against HPH derive solely from Lee's claims against Kapi'olani and, therefore, must also be dismissed; and (3) HPH is a separate legal

entity, is not in an employer-employee or agency relation with Kapi'olani, and HPH did not direct or control the clinical medical care or decisions undertaken by the health care providers of Kapi'olani.

Lee opposed the motion. The defendants replied to Lee's opposition. The Circuit Court held a hearing and entertained argument from both sides. On August 31, 2006, the Circuit Court entered an order granting the defendants' motion to dismiss "on jurisdiction grounds." The Circuit Court's order stated, in relevant part: "[I]t appears that some of the claims sound in negligence and that [HPH] and [Kapi'olani] are health care providers, and therefore Plaintiffs must exhaust the administrative remedies of the MCCP before they may file a complaint in court."

On September 15, 2006, Kapi'olani and HPH filed a motion for attorneys' fees and costs, claiming entitlement to attorneys' fees pursuant to HRS § 607–14.5 and Hawai'i Rules of Civil Procedure (**HRCP**) Rule 11 because the filing of Lee's claims was purportedly frivolous. After consideration of the defendants' motion, Lee's opposition, the defendants' reply, and argument of counsel, on October 18, 2006, the Circuit Court entered an order granting costs in the amount of $219.02, and denying an award of attorneys' fees.

On February 23, 2007, the Circuit Court entered a Final Judgment (**Final Judgment**) in favor of HPH and Kapi'olani, and against Lee, on Counts I through IV of Lee's Complaint, and dismissed HPH and Kapi'olani's Third–Party Complaint.[2] The Final Judgment provided that any and all remaining claims were dismissed.

On March 22, 2007, HPH filed a notice of appeal, stating its appeal from the Final Judgment, a copy of which was attached to the notice of appeal. On March 27, 2007,

Lee filed a notice of appeal, effectively a notice of cross-appeal, also stating that she was appealing from the Final Judgment. In addition to a copy of the Final Judgment, Lee attached copies of the Circuit Court's August 31, 2006 order dismissing her claims and the October 20, 2006 order granting costs and denying attorneys's fees. On April 10, 2007, HPH and Kapi'olani filed a notice of cross-appeal, stating their appeal from the Final Judgment, but—along with a copy of the Final Judgment—attaching a copy of the October 20, 2006 order granting costs and denying attorneys' fees. More specifically, the notice stated:

> Notice is hereby given that Defendants [HPH and Kapi'olani], by and through their attorneys, Tom Petrus & Miller, LLLC, pursuant to section 641–1(a) and (c), Hawaii Revised Statutes, and Rules 3, 4, and 4.1 of the Hawai'i Rules of Appellate Procedure, appeal to the Intermediate Court of Appeals of the State of Hawai'i from the Final Judgment, filed herein on February 23, 2007, and attached hereto as Exhibit "A."

> Attached as Exhibit "B" is the court's "Order Granting in Part and Denying in Part Defendants [HPH and Kapi'olani's] Motion for Taxation of Costs and Award of Attorneys' Fees, Filed September 15, 2006," entered on October 20, 2006, from which the subject issue of this cross-appeal arises."

### C. *The Parties' Briefs*

Although HPH and Kapi'olani, who are jointly represented by the same law firm, filed all pleadings and other papers jointly in the Circuit Court, they filed separate briefs on appeal. On their jointly-filed notice of cross-appeal, HPH and Kapi'olani describe themselves as defendants and cross-appellants. On their jointly-filed statement of jurisdiction, HPH and Kapi'olani describe

---

2. The Circuit Court had previously entered two other judgments, but neither qualified as appealable final judgments because of a failure to specifically identify which claim or claims the judgments resolved. Consequently, Lee's prior appeal and HPH and Kapi'olani's prior cross-appeal were dismissed for lack of appellate jurisdiction. *Lee v. Hawai'i Pacific Health*, No. 28267, 2007 WL 495911, at *1 (Haw.App. Feb. 1, 2007).

themselves as defendants-appellants and cross-appellees. On the briefs, HPH describes itself as defendant-appellant and cross-appellee, whereas Kapi'olani describes itself as defendant-cross-appellee and cross-appellant.

On her initial notice of appeal, Lee refers to herself as the plaintiff-appellant. However, in her jurisdictional statement and on the briefs, Lee describes herself as plaintiff-appellee and cross-appellant.

## III. DISCUSSION

### A. Appeals, Cross–Appeals & Appellate Jurisdiction

Based on our review of the notices of appeal, the jurisdictional statements, and the parties' self-denomination, it appears that there was, at the very least, confusion about how and when appeals may be taken, and the parties' proper denomination. Thus, before we address the merits of the parties' arguments, we will attempt to shed light on these issues and how they affect our jurisdiction in this case.

██ HPH timely filed a notice of appeal on March 22, 2007, within 30 days after the entry of the Final Judgment. See Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 4(a)(1) ("When a civil appeal is permitted by law, the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order."). It is well-established that an appeal from a final judgment brings up for review all prior interlocutory orders that were not directly appealable. See, e.g., Ueoka v. Szymanski, 107 Hawai'i 386, 396, 114 P.3d 892, 902 (2005); City & County v. Midkiff, 57 Haw. 273, 554 P.2d 233 (1976); Pioneer Mill Co. v. Ward, 34 Haw. 686 (1938);

Prof'l Sponsoring Fund, Inc. v. Krishna Venkata Somayajulu RAO, 5 Haw.App. 382, 383, 694 P.2d 885, 886 (1985); Kahalewai v. Rodrigues, 4 Haw.App. 446, 450, 667 P.2d 839, 842 (1983). In this case, HPH's appeal from the Final Judgment brought up for review the prior orders that were challenged in its opening brief, specifically including the August 31, 2006 order granting HPH and Kapi'olani's motion to dismiss and the October 20, 2006 order granting costs and denying attorneys' fees to HPH and Kapi'olani. Thus, as further discussed below, HPH's filing of a cross-appeal in this case was redundant and without effect.

As the first party to file a notice of appeal in this case, HPH is necessarily denominated the appellant. See HRAP Rule 3(d).[3] As a defendant in the proceeding below, HPH is the defendant-appellant. Id. As stated in HRAP Rule 3(d), all other parties shall be denominated appellees.

On March 27, 2007, Lee filed a notice, also entitled "notice of appeal." But for the filing of HPH's notice of appeal, Lee's notice of appeal, which was filed more than 30 days after the entry of the Final Judgment, would have been untimely. See HRAP Rule 4(a)(1). However, HRAP Rules 4.1(a)(2) & 4.1(b)(1) provide:

(a) Right of cross-appeal.

. . . .

(2) In civil cases involving multiple-party plaintiffs or defendants, if one party files a timely notice of appeal, any other party, whether on the same or opposite side as the party first appealing, may file a cross-appeal against all or any of the other parties to the case as well as against the party who first appealed. If the cross-

---

**3.** HRAP Rule 3(d) provides:

(d) *Denomination of the parties.* The party appealing shall be denominated the appellant and by the appellant's denomination in the proceeding from which the appeal is taken so that an appellant shall be denominated plaintiff-appellant or petitioner-appellant or defendant-appellant or respondent-appellant. All other parties shall be denominated appellees,

and each appellee's denomination in the proceeding from which the appeal is taken shall also be include[d] so that each appellee shall be denominated plaintiff-appellee or petitioner-appellee or defendant-appellee or respondent-appellee. Any appellee who supports the position of an appellant shall meet the time schedule for filing papers that is provided for that appellant.

appeal operates against a party not affected by the first appeal or in a manner different from the first appeal, that party may file a further cross-appeal as if the cross-appeal affecting that party had been the first appeal.

. . . .

(b) *Manner and Time of Filing.*

(1) The cross-appellant shall file with the clerk of the court appealed from a notice of cross-appeal and pay the filing fee within 14 days after the notice of appeal is served on the cross-appellant, or within the time prescribed for filing the notice of appeal, whichever is later.

 We hold that any notice of appeal filed within 14 days after the initial notice of appeal is served shall be construed as a timely notice of cross-appeal, however denominated. Although this issue does not appear to have been addressed in a prior reported decision, it has been the practice of this court to so recognize second-in-time or other subsequent notices of appeal as cross-appeals. This recognition is consistent with the plain language of HRAP Rule 4.1(a)(2)— "if one party files a timely notice of appeal, any other party, whether on the same or opposite side as the party first appealing, may file a cross-appeal"—as well as HRAP Rule 3(b)'s mandate to denominate the first appellant as the only appellant and "all other parties" as appellees. This construction is also consistent with Hawai'i cases holding that failure to properly designate the judgment appealed from is not jurisdictional. *See, e.g., In re Brandon,* 113 Hawai'i 154, 149 P.3d 806 (App.2006); *State v. Graybeard,* 93 Hawai'i 513, 6 P.3d 385 (App.2000). Failure to properly designate a cross-appeal as a cross-appeal is not jurisdictional.

Accordingly, we conclude that Lee timely filed a cross-appeal and is properly designated as the plaintiff-appellee and cross-appellant. With the filing of Lee's cross-appeal,

HPH and Kapi'olani became cross-appellees, in addition to their respective denomination as defendant-appellant and defendant-appellee.

 On April 10, 2007, HPH and Kapi'olani filed a "notice of cross-appeal." With respect to HPH, we first note that no Hawai'i appellate court rule requires or allows the appellant to file a cross-appeal. HRAP Rule 4.1(a)(2) states, in the first instance, "if one party files a timely notice of appeal, *any other party,* whether on the same or opposite side as the party first appealing, may file a cross-appeal[.]" (Emphasis added.) This portion of the rule contemplates cross-appeals by parties other than the party first appealing, in this case Lee and/or Kapi'olani, not HPH.

HRAP Rule 4.1(a)(2) continues, "[i]f the cross-appeal operates against a party not affected by the first appeal or in a manner different from the first appeal, that party may file a further cross-appeal as if the cross-appeal affecting that party had been the first appeal." In this case, in both its initial notice of appeal and its notice of cross-appeal, HPH appealed from the Final Judgment. Lee also appealed from the Final Judgment. HPH has offered no argument or authority supporting the proposition that HPH is "not affected by" its own appeal in this case or that Lee's appeal from the same Final Judgment brought up for review any matters that were not already implicated by HPH's initial notice of appeal. We reject the notion that an HRAP Rule 4.1(a)(2) cross-appeal from the same final judgment as the initial appeal can trigger additional rights of appellate review for the appellant.[4]

Next, we consider Kapi'olani's cross-appeal, which was filed within 14 days of Lee's cross-appeal, but not within 14 days of the initial appeal. In HPH and Kapi'olani's statement of jurisdiction, the grounds upon which this court's jurisdiction over the cross-appeal is invoked is stated as follows:

> Michigan Appellate Rules, Rule 7.207(A)(2). The Michigan rule has no commentary and no reported cases on point.

---

**4.** There is no commentary to HRAP Rule 4.1 and there are no reported cases on point. Upon review, it appears that the only other state that has adopted this formulation is Michigan. *See*

HRAP Rule 4.1 provides that a notice of cross-appeal shall be filed within fourteen days after the filing of a timely NOA by another party. HAW.R.APP.P. 4.1. Defendants do not concede jurisdiction with respect to Plaintiff's NOA. Defendants leave Plaintiff to establish the timeliness of Plaintiff's own NOA, filed on March 27, 2007, which appears to have been processed by the clerk as a NOCA, having been filed after Defendants' NOA. [ ]

In the event that Plaintiff establishes jurisdiction with respect to Plaintiff's NOA, then Defendants' NOCA is also timely by definition of HRAP 4.1. On April 10, 2007, within 14 days of service of the Plaintiff's NOCA, Defendants filed a NOCA to cross-appeal the Plaintiff's challenge to the Circuit Court's October 20, 2006 order with respect to Defendants' Motion for Costs.

Kapi'olani's statement of jurisdiction provides little or nothing in the way of support for the proposition that it is either "a party not affected by the first appeal" or that it is affected by the cross-appeal "in a manner different from the first appeal." As noted above, HPH's appeal from the Final Judgment brought up for review all prior interlocutory orders that were not directly appealable, including the order granting costs and denying fees to Kapi'olani and HPH. HRAP Rule 4.1(a)(2) specifically allows parties on the "same side" as the appellant to file a cross-appeal. Notwithstanding Kapi'olani's reference to "Plaintiff's challenge to the Circuit Court's October 20, 2006 order with respect to Defendants' Motion for Costs," Lee's cross-appeal from the Final Judgment added nothing new to the issues for possible review on appeal.

■ A party seeking to cross-appeal from a cross-appeal pursuant to the latter part of HRAP Rule 4.1(a)(2) has the burden to establish the additional grounds required by the rule for the extended filing period. Kapi'olani has failed to demonstrate (or even argue) that the second notice of appeal from the Final Judgment in this case affected it

differently or in a different manner than the first notice of appeal from the Final Judgment. Accordingly, Kapi'olani's cross-appeal must be dismissed as untimely because it was not filed within 14 days of HPH's notice of appeal and it did not satisfy one of the requirements for filing a cross-appeal from a cross-appeal. *See Bacon v. Karlin,* 68 Haw. 648, 650, 727 P.2d 1127, 1128 (1986); HRAP Rule 26(b) ("[N]o court or judge or justice thereof is authorized to change the jurisdictional requirements contained in Rule 4 of [the HRAP].").

## B. *HPH's Arguments on Appeal*

### 1. HPH is a Health Care Provider in the Context of HRS Chapter 671

HPH maintains that although the Circuit Court correctly dismissed the Complaint, the dismissal was based upon the erroneous conclusion that HPH is a "health care provider" within the meaning of HRS Chapter 671. HPH also argues that upon dismissal of Lee's Complaint against Kapi'olani, no viable claims remained against HPH because all such claims "were based on derivative liability, limited to allegations of agency, conspiracy, and alter egos, through HPH's alleged relationship with [Kapi'olani]." The gravamen of HPH's argument appears to be that: (a) Lee's claims against HPH are not subject to review by the MCCP because HPH is not a health care provider; and (b) because Lee's claims against HPH stem from the alleged acts and/or admissions of Kapi'olani and the claims against Kapi'olani were necessarily dismissed pending review by the MCCP, Lee's claims against HPH also must be dismissed in the Circuit Court action. In sum, Lee may not bring claims against HPH before either the MCCP or the Circuit Court.

■ As the Hawai'i Supreme Court has previously discussed, HRS Chapter 671 was enacted for the purpose of stabilizing the medical malpractice insurance situation by, *inter alia,* improving the efficiency and reducing the cost of legal claims arising out of alleged medical torts. *See, e.g., Garcia v.*

*Kaiser Found. Hosps.,* 90 Hawai'i 425, 438–39, 978 P.2d 863, 876–77 (1999); *Tobosa v. Owens,* 69 Haw. 305, 311–12, 741 P.2d 1280, 1285 (1987). The MCCP process was created to encourage early settlement of claims and to weed out unmeritorious claims through review, rendering of findings, and issuance of advisory opinions on issues of liability and damages by panels with both medical and legal expertise. *See* HRS § 671–11 (1993 and Supp.2003); *Garcia,* 90 Hawai'i at 438, 978 P.2d at 876.

HRS § 671–12(a) (1993) states in relevant part that "any person or the person's representative claiming that a **medical tort** has been committed shall submit a statement of the claim to the [MCCP] before a suit based on the claim may be commenced in any court of this State." (Emphasis added.) HRS Chapter 671 further provides the circumstances under which claims may be filed in court:

> § 671–16 Subsequent litigation; excluded evidence. The claimant may institute litigation based upon the claim in an appropriate court *only after a party to a medical claim conciliation panel hearing rejects the decision of the panel,* or after the twelve-month period under section 671–18 has expired.

HRS § 671–16 (Supp.2003) (footnote and emphasis added).

Under HRS § 671–1(2) (1993), a medical tort is "professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, *by a health care provider,* which proximately causes death, injury, or other damage to a patient." (Emphasis added.)

HRS § 671–1(1) provides the definition of a "health care provider" as follows:

> (1) "Health care provider" means a physician or surgeon licensed under chapter 453, a physician and surgeon licensed under chapter 460, a podiatrist licensed under chapter 463E, a health care facility as defined in section 323D–2, and

the employees of any of them. Health care provider shall not mean any nursing institution or nursing service conducted by and for those who rely upon treatment by spiritual means through prayer alone, or employees of such institution or service.

HRS § 323D–2 (1993) defines the terms "health care facility" and "health care service" to include:

> [A]ny program, institution, place, building, or agency, or portion thereof, private or public, other than federal facilities or services, whether organized for profit or not, used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care to any person or persons. The terms include, but are not limited to, health care facilities and health care services commonly referred to as hospitals, extended care and rehabilitation centers, nursing homes, skilled nursing facilities, intermediate care facilities, hospices for the terminally ill that require licensure or certification by the department of health, kidney disease treatment centers including freestanding hemodialysis units, outpatient clinics, organized ambulatory health care facilities, emergency care facilities and centers, home health agencies, health maintenance organizations, and others providing similarly organized services regardless of nomenclature.

In keeping with the clear legislative intent to maximize the MCCP process as a tool to screen, settle, limit, and/or streamline potential lawsuits arising out of health-care-related claims, Hawai'i courts have interpreted these terms broadly. *See, e.g., Dubin v. Wakuzawa,* 89 Hawai'i 188, 190, 194–95, 970 P.2d 496, 498, 502–03 (1998) (holding that claims grounded in alleged unauthorized disclosure of privileged information, including breach of contract, breach of fiduciary duty, breach of patient-physician relationship, defamation and perjury, and negligent/intentional infliction of emotional distress, were medical torts for the purpose of HRS Chapter 671); *Doe v. City and County of Honolulu,* 93 Hawai'i

490, 499–502, 6 P.3d 362, 371–74 (App.2000) (holding that City and County of Honolulu, as an employer requiring a physical examination, the State Department of Health (**DOH**), as the employer of the physician who examined the City and County's employee, and DOH's director, in his official capacity, were each within the definition of health care providers and health care facilities; Jane Doe's claims, including sexual assault and battery, sexual harassment, invasion of privacy, false imprisonment, violation of public policy, negligent hiring/retention, negligent and intentional infliction of emotional distress, were medical torts that had to be submitted to MCCP).

■ HPH is a Hawai'i non-profit organization, which serves as the parent corporation of four affiliated hospitals in Hawai'i, including Kapi'olani, a wholly-owned subsidiary of HPH. HPH argues that it is not a health care provider as defined in HRS § 671–1(a) because, *inter alia*, HPH is not a surgeon, not a podiatrist, not a program, institution, place or agency, and provides no medical diagnosis, treatment, nursing, rehabilitative, preventive care, or clinical medical services to any person or persons. HPH admits owning, but denies operating, health care facilities. In its arguments to the Circuit Court, however, HPH acknowledged that Lee *alleged* that HPH, as well as Kapi'olani, acted wrongfully in conjunction with Ross's medical care. In their motion to dismiss, HPH and Kapi'olani described Lee's claims as follows (emphasis added):

> The gravamen of the Plaintiffs' Complaint is that [Kapi'olani] *and HPH* acted in concert "fraudulently inducing Ross to choose [Kapi'olani] for a bone marrow transplant, and then wrongfully and unreasonably refusing to admit him to the [Kapi'olani] Pediatric Intensive Care Unit[.]" . . . These allegations raise obvious questions of "professional negligence, the rendering of professional service without

informed consent, or an error or omission in professional practice" by [Kapi'olani], a health care provider, and that the actions of [Kapi'olani] caused damages to a patient.

■ By HPH's own construction, Lee's claims against HPH are based upon a claim that a medical tort has been committed. *See* HRS § 671–12(a) (any person claiming that a medical tort has been committed shall submit the claim to the MCCP before a suit "based on the claim" may be commenced in court). We reject HPH's framing of the allegations as being directed only at Kapi'olani. In addition, we reject HPH's argument that, as a matter of law, a non-profit corporation that owns a system of hospitals and clinics is not a "program" or "institution" designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care to any person or persons. HRS § 323D–2 broadly states that the terms "health care facility" and "health care service" include "hospitals, . . . outpatient clinics, organized ambulatory health care facilities, emergency care facilities and centers, home health agencies, health maintenance organizations, *and others providing similarly organized services regardless of nomenclature.*" (Emphasis added.) While HPH has the opportunity to deny that it in fact is engaged in such activities, for the purpose of deciding whether the MCCP is the appropriate forum for the initiation of Lee's claims against HPH, HPH must be considered to be a health care provider in the context of HRS Chapter 671.[5] A less-inclusive construction would result in dual-track filing of claims, one before the MCCP and one before the Circuit Court, defeating the legislative intent to utilize the MCCP as the initial reviewer, essentially the gate-keeper, in the broadest possible range of health-care-related claims.

In light of our conclusion that the Circuit Court did not err in dismissing Lee's claims against HPH because such claims must first

---

5. We reject Lee's request to take judicial notice of HPH's website, which purportedly states that HPH's mission is to provide the highest quality health care and services to the people of Hawai'i and the Pacific Region through its hospitals, clinics, outpatient centers, and physicians. *See* HRS § 641–2 (Supp.2008).

**246**

be submitted to the MCCP, we do not reach HPH's arguments regarding alternative grounds for dismissal or summary judgment.

### 2. HPH's Claim that Lee's Complaint Was a Frivolous Filing

HPH argues that it was entitled to an award of attorneys' fees pursuant to HRS § 607–14.5 because "HRS Chapter 671 clearly and unambiguously confers upon the MCCP original and exclusive jurisdiction until the MCCP process has been completed." Noting that Lee filed claims against HPH and Kapi'olani before the MCCP, as well as in the Circuit Court, HPH also argues that the simultaneous filing of claims in both tribunals was lacking in candor and an act of bad faith. HPH urges this court to find that the Circuit Court's denial of attorneys' fees was an abuse of its discretion.

■■■ In order for HPH to recover attorneys' fees and costs under HRS § 607–14.5 (Supp.2005),[6] a court must specifically find that all or a portion of Lee's claims were frivolous. A frivolous claim is one "manifestly and palpably without merit, so as to indi-

cate bad faith on the pleader's part such that argument to the court was not required." *Doe v. Doe*, 118 Hawai'i 268, 285, 188 P.3d 782, 799 (App.2008) (brackets and internal quotation marks omitted).

■■■ Lee argues that, notwithstanding the provisions of HRS § 671–18,[7] she had a good faith belief that her claims against HPH could be barred by the statute of limitations if she submitted them first to the MCCP and the MCCP determined that it had no jurisdiction to render a decision on her claims. First, we agree with HPH that Lee's concerns were not well-founded. Pursuant to a plain reading of HRS § 671–18, the filing of a claim with the MCCP tolls any applicable statute of limitations until 60 days after an MCCP decision on the claim, including a dismissal for lack of jurisdiction. That said, it does not appear that there is any Hawai'i precedent confirming this interpretation. In addition, it appears from the record that Lee attempted to secure a waiver of the statute of limitations from HPH and Kapi'olani pending a ruling on the jurisdictional issue. Although the defendants had no obligation to agree to the waiver, Lee's request undercuts the no-

---

6. In relevant part, HRS § 607–14.5 states:

 **§ 607–14.5 Attorneys' fees and costs in civil actions.** (a) In any civil action in this State where a party seeks money damages or injunctive relief, or both, against another party, and the case is subsequently decided, the court may, as it deems just, assess against either party, whether or not the party was a prevailing party, and enter as part of its order, for which execution may issue, a reasonable sum for attorneys' fees and costs, in an amount to be determined by the court upon a specific finding that all or a portion of the party's claim or defense was frivolous as provided in subsection (b).

 (b) In determining the award of attorneys' fees and costs and the amounts to be awarded, the court must find in writing that all or a portion of the claims or defenses made by the party are frivolous and are not reasonably supported by the facts and the law in the civil action. In determining whether claims or defenses are frivolous, the court may consider whether the party alleging that the claims or defenses are frivolous had submitted to the party asserting the claims or defenses a request for their withdrawal as provided in subsection (c). If the court determines that only a portion of the claims or defenses made by the party are

frivolous, the court shall determine a reasonable sum for attorneys' fees and costs in relation to the frivolous claims or defenses.

7. HRS § 671–18 (Supp.2003) provides for tolling of the statute of limitations period pending an MCCP decision:

 The filing of the claim with the medical claim conciliation panel or with an approved alternative dispute resolution provider shall toll any applicable statute of limitations, and any such statute of limitations shall remain tolled until sixty days after the date the decision of the panel or the notification of completion from the approved alternative dispute resolution provider is mailed or delivered to the parties. If a decision by the medical claim conciliation panel is not reached within twelve months, or the alternative dispute resolution process is not completed within twelve months, the statute of limitations shall resume running and the party filing the claim may commence a suit based on the claim in any appropriate court of this State. The panel or the approved alternative dispute resolution provider shall notify all parties in writing of this provision.

tion that the filing of the Complaint was done in bad faith, in an attempt to avoid an MCCP proceeding.

Lee further argues that: (1) she was not a patient and therefore, the HRS § 671–1(2) definition of medical tort was not intended to include her independent claims for intentional and negligent infliction of emotional distress; and (2) HPH administrators may not lawfully practice medicine and thus their overrides of doctors' orders do not constitute medical torts under HRS Chapter 671. These arguments, too, are not well-founded. *See* Section III.B.1. above (discussing HPH as a health care provider under HRS Chapter 671) and Section III.C. below (rejecting Lee's argument that, because she was not a patient, her claims on her own behalf are not subject to MCCP review).

Although we reject Lee's arguments, we cannot conclude that under the circumstances of this case—including that HPH agrees with Lee's argument that claims against HPH do not fall within the ambit of the MCCP—the filing of Lee's Complaint was so manifestly and palpably without merit that the Circuit Court abused its discretion in denying an award of attorneys' fees. *See, e.g., Allstate Ins. Co. v. Pruett,* 118 Hawai'i 174, 179, 186 P.3d 609, 614 (2008) ("[A]n abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.") (citations and internal quotation marks omitted).

### C. *Lee's Argument on Appeal*

■ Lee's contention on appeal is basically that, because she was not the patient, she is not asserting a claim as a victim of a medical tort. Therefore, Lee argues, with respect to the claims she brought on her own behalf, the Circuit Court erred in concluding that she was required to exhaust the admin-istrative remedies of the MCCP. We disagree.

As noted by HPH and Kapi'olani, HRS § 671–12(a) states that *"any person* or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the [MCCP] before a suit based on the claim may be commenced in any court of this State." (Emphasis added.) The statute's application is not limited only to patients, but includes any person whose claim involves a medical tort, within the meaning of HRS Chapter 671. Although Lee was not the patient in this case, her allegations arise directly from what can only be described as an alleged medical tort involving her son, a patient. This construction has been implicitly adopted in prior Hawai'i Supreme Court cases that have treated non-patient spouses' claims as falling within the requirements of HRS Chapter 671. *See Garcia,* 90 Hawai'i at 437–41, 978 P.2d at 875–79; *Tobosa v. Owens,* 69 Haw. 305, 308–15, 741 P.2d 1280, 1283–87 (1987). This interpretation is also most consistent with the legislative intent to utilize the MCCP as the initial reviewer in the broadest possible range of health-care-related claims. Accordingly, we affirm the Circuit Court's dismissal of Lee's claims for lack of jurisdiction.

### IV. *CONCLUSION*

For the foregoing reasons, the Circuit Court's February 23, 2007 Final Judgment is affirmed.